[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-10468
_____

D.C. Docket Nos. 1:09-cv-23835-ASG,

1:09-md-02106-ASG

AVENUE CLO FUND LTD.,
AVENUE CLO II, LTD.,
AVENUE CLO III, LTD.,
AVENUE CLO IV, LTD.,
AVENUE CLO V, LTD.,
AVENUE CLO VI, LTD.,
BRIGADE LEVERAGED CAPITAL STRUCTURES FUND, LTD.,
BATTALION CLO 2007-I LTD.,
CASPIAN CORPORATE LOAN FUND, LLC.,
CASPIAN CAPITAL PARTNERS, L.P.,
CASPIAN SELECT CREDIT MASTER FUND, LTD.,
ING PRIME RATE TRUST,
ING SENIOR INCOME FUND,
ING INTERNATIONAL (II) -SENIOR BANK LOANS EURO,
ING INVESTMENT MANAGEMENT CLO I, LTD.,
ING INVESTMENT MANAGEMENT CLO II, LTD.,
ING INVESTMENT MANAGEMENT CLO III, LTD.,
ING INVESTMENT MANAGEMENT CLO IV, LTD.,
ING INVESTMENT MANAGEMENT CLO V, LTD.,
VENTURE II CDO 2002, LIMITED,
VENTURE III CDO LIMITED,
VENTURE IV CDO LIMITED,
VENTURE V CDO LIMITED,
VENTURE VI CDO LIMITED,
VENTURE VII CDO LIMITED,
VENTURE VIII CDO LIMITED,

VENTURE IX CDO LIMITED,
VISTA LEVERAGED INCOME FUND,
VEER CASH FLOW CLO, LIMITED,
MARINER LDC,
MARINER OPPORTUNITIES FUND,L.P.,
GENESIS CLO 2007-1 LTD.,
CANPARTNERS INVESTMENTS IV, LLC,
CANYON CAPITAL ADVISORS, LLC.,
CANYON SPECIAL OPPORTUNITIES MASHTER FUND (CANYON), LTD.,
SCROGGIN CAPITAL MANAGEMENT II,
SCROGGIN INTERNATIONAL FUND LTD.,
SCROGGIN WORLDWIDE FUND LTD.,
CANTOR FITZGERALD SECURITIES,
OLYMPIC CLO I, LTD.,
SHASTA CLO I, LTD.,
WHITNEY CLO I LTD.,
SAN GABRIEL CLO I LTD.,
SIERRA CLO II LTD.,
SPCP GROUP, LLC,
STONE LION PORTFOLIO L.P.,
VENOR CAPITAL MASTER FUND, LTD.,

Plaintiffs - Appellants,

versus

BANK OF AMERICA, NA,
MERRILL LYNCH CAPITAL CORP.,
JPMORGAN CHASE BANK, N.A.,
BARCLAYS BANK, PLC,
DEUTSCHE BANK TRUST COMPANY AMERICAS,
ROYAL BANK OF SCOTLAND GROUP PLC, et al.,

Defendants - Appellees.

2

_____

No. 11-10740

_____

D.C. Docket Nos.  1:10-cv-20236-ASG,

1:09-md-02106-ASG

BRIGADE LEVERAGED CAPITAL STRUCTURES FUND, LTD.,
MONARCH MASTER FUNDING, LTD.,
VENOR CAPITAL MASTER FUND, LTD., et al.,

Plaintiffs - Appellants,

versus

BANK OF AMERICA, NA,
MERRILL LYNCH CAPITAL CORP.,
JPMORGAN CHASE BANK, N.A.,
BARCLAYS BANK, PLC,
DEUTSCHE BANK TRUST COMPANY AMERICAS, et al.,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 20, 2013)

Before TJOFLAT, MARTIN and BUCKLEW,[*] Circuit Judges.

MARTIN, Circuit Judge:

_____

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

3

This case presents more fallout from the failure of the ambitious Fontainebleau development in Las Vegas, Nevada. In this appeal, we address a contract dispute and two District Court decisions. The contract was entered into by appellants Avenue CLO Fund, Ltd., and others, who provided term loans (the Term Lenders); the appellee Bank of America, N.A., and others, who provided revolving loans (the Revolving Lenders); and Fontainebleau Las Vegas LLC and Fontainebleau Las Vegas II LLC, who borrowed the money (the Borrowers). The Borrowers are represented here by Soneet R. Kapila, who is the Chapter 7 Bankruptcy Trustee for the Fontainebleau Estate. In separate actions, the Borrowers and the Term Lenders sued the Revolving Lenders for breach of contract. In one case, the District Court dismissed the Term Lenders' claims against the Revolving Lenders, finding that the Term Lenders lacked standing to sue. In the other case, the District Court denied the Borrowers' motion for summary judgment against the Revolving Lenders, rejecting the Borrowers' argument that the Revolving Lenders had breached the contract as a matter of law and alternatively finding there are material issues of fact about whether the Revolving Lenders breached the contract. After careful review, and having had the benefit of oral argument, we affirm both rulings by the District Court.

## I.    BACKGROUND

### A.    FACTS

4

The Borrowers were the owners and developers of a casino-resort to be built in Las Vegas, Nevada (the Project).  The Project was funded through a series of agreements, including a Credit Agreement and a Disbursement Agreement.  These agreements set the terms by which the Borrowers could borrow the funds needed to complete the Project.

Here, the parties dispute the meaning of section 2 of the Credit Agreement, through which the Revolving Lenders promised to lend the Borrowers money by an agreed-upon process, once the Borrowers satisfied certain conditions. Specifically, under section 2.1(c)(iii) of the Credit Agreement, "each Revolving Lender severally agree[d] to make Revolving Loans . . . to Borrowers . . . provided that . . . unless the Total Delay Draw Commitments [had] been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."

On March 2, 2009, the Borrowers requested $350 million in Delay Draw Term Loans and $670 million in Revolving Loans.[1]  The next day, Bank of America, as Administrative Agent,[2] rejected the Borrowers' request, explaining

---

[1] The next day, the Borrowers re-submitted their request to correct a "scrivener's error" by reducing their Revolving Loan request to $656,522,698.  Bank of America rejected the Borrowers' March 3, 2009 request—which corrected the scrivener's error—for the same reason it rejected the March 2, 2009 request.

[2] The Credit and Disbursement Agreements established the Bank of America as both a Revolving Lender and the Administrative Agent.  The contract provided that the Borrowers would submit lending requests to Bank of America as Administrative Agent.  Then, Bank of America as

that the request did not comply with Section 2.1(c)(iii) of the Credit Agreement, by which the parties agreed that the outstanding principal amount of all Revolving Loans would not exceed $150 million unless the Total Delay Draw Commitments had been fully drawn. In other words, the Bank of America denied the Borrowers' request because it asked for Delay Draw Term Loans and Revolving Loans at the same time. The Borrowers responded to Bank of America's rejection, stating that their request complied with the Credit Agreement because "fully drawn" meant "fully requested," not "fully funded." Thus, the Borrowers argued then, as they do now, that the simultaneous request for the Delay Draw Term Loans and the remainder of the Revolving Loans was in compliance with the Credit Agreement.[3]

During March and April 2009, the parties talked about the financial condition of the Project. On April 20, 2009, the Revolving Lenders told the Administrative Agent that the Borrowers had defaulted on the lending conditions. As a result, the Revolving Lenders refused to give more funding to the Borrowers and the Project collapsed.

---

Administrative Agent would notify each lender of the request so that the lender could make its pro rata share of the funds available to the Administrative Agent. Then, "[u]pon satisfaction or waiver of the applicable conditions precedent specified in Section 2.1," the Administrative Agent was to make the funds available in the Bank Proceeds Account, as consistent with the conditions set forth in the Disbursement Agreement.

[3] Specifically, the Borrowers responded: "To be clear, Section 2.1(c)(iii) does not require the Delay Draw Term Loan Commitment to have been <u>funded prior</u> to drawing down the Revolving Loans; instead, this provision restricts the <u>outstanding</u> amount of the Revolving Loans <u>unless</u> the Total Delay Draw Commitments have been <u>fully drawn</u>." (emphasis in original).

## B.    PROCEDURAL HISTORY

On June 9, 2009, the Borrowers filed for bankruptcy in the Southern District of Florida and sued the Revolving Lenders in that proceeding.  The Borrowers alleged that the Revolving Lenders breached their contract by, among other things, refusing to fund the loan payment on March 2, 2009.  On June 10, 2009, the Borrowers moved for summary judgment in Bankruptcy Court, seeking a judgment that the Revolving Lenders breached the Credit Agreement by failing to fund the Borrowers' March 2, 2009 request and asking for a Turnover Order pursuant to section 542 of the Bankruptcy Code.  Next, the District Court for the Southern District of Florida withdrew the reference to the Bankruptcy Court and took over the case.  On August 26, 2009, the District Court denied the Borrowers' motion for partial summary judgment and request for an order directing the turnover of funds.

In separate law suits, various Term Lenders sued the Revolving Lenders. Avenue CLO Fund, Ltd., and others, sued the Revolving Lenders in the District of Nevada.  ACP Master, Ltd., and others, sued the Revolving Lenders in the Southern District of New York.  On December 2, 2009, these cases were merged into a multi-district litigation action in the Southern District of Florida.  The Revolving Lenders then moved to dismiss the Term Lenders' complaints. On May 28, 2010, the District Court dismissed with prejudice the Delay Term Lenders' claims against the Revolving Lenders, finding that the Term Lenders had no

7

standing to enforce the Revolving Lenders' promise to lend to the Borrowers because the Term Lenders were not the intended beneficiaries of that promise.

The Borrowers filed a notice of appeal on October 18, 2010. The Term Lenders filed a notice of appeal on January 19, 2011. We consolidated the two appeals, and have now had the benefit of the parties' oral arguments.

## II.    DISCUSSION

We review the District Court's dismissal for lack of standing de novo. Wright v. Dougherty Cnty., Ga., 358 F.3d 1352, 1354 (11th Cir. 2004). We also review the District Court's summary judgment decision de novo, applying the same legal standard as the District Court. See Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003). "The interpretation of a contract is a question of law that the court reviews de novo." Daewoo Motor Am. v. Gen. Motors Corp., 459 F.3d 1249, 1256 (11th Cir. 2006). The parties agree that New York law governs the interpretation of the contract.

### A. DISMISSAL OF THE TERM LENDERS' CLAIMS AGAINST THE REVOLVING LENDERS FOR LACK OF STANDING

To establish standing for Article III purposes, the Term Lenders must show that they held a legally protected interest in the Credit Agreement which was injured by the Revolving Lenders. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992); Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 173 (2d Cir. 2005) ("[A] plaintiff

8

must have standing under both Article III of the Constitution and applicable state law in order to maintain a [breach of contract] cause of action."). We look to New York law to determine if the Term Lenders had a legally protected interest in the Credit Agreement that allows them to sue the Revolving Lenders. See Mid-Hudson Catskill, 418 F.3d at 173. Under New York law, the Term Lenders may enforce a promise made in the Credit Agreement if either the contract language "clearly evidences an intent to permit enforcement" by the Term Lenders or if no other party may recover for the alleged breach of contract. See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 45 (N.Y. 1985).

The Term Lenders argue that the parties intended for them to enforce section 2.1(c) of the Credit Agreement. Specifically, they assert that the Term Lenders were the intended beneficiaries of the Revolving Lenders' promise to lend to the Borrowers. Because the intended beneficiary of a promise may enforce that agreement, the Term Lenders argue that they have standing to enforce the section 2.1(c) promise. While they concede that the language of section 2.1(c) "says nothing about whether the parties intended to give the Term Lenders the benefit of that obligation," the Term Lenders point to a separate provision in the Credit Agreement and provisions in the Disbursement Agreement to argue that they were the intended beneficiaries of the section 2.1(c) promise.

9

First, the Term Lenders direct us to section 10.6(a) of the Credit Agreement, which provides that "[t]he provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns." From this, the Term Lenders argue that "all parties are intended beneficiaries of all provisions" of the Credit Agreement. However, we are not persuaded by this because the broad-sweeping language in section 10.6(a) does not clearly show the parties' intent for the Term Lenders to enforce or benefit from the promise of the Revolving Lenders to fund the Borrowers. Stainless, Inc. v. Emp'r Fire Ins. Co., 418 N.Y.S.2d 76, 80 (N.Y. App. Div. 1979) ("The terms contained in the contract must clearly evince an intention to benefit the third person who seeks the protection of the contractual provisions."). Certainly, the Term Lenders' argument that all parties were intended beneficiaries of section 2.1(c) does not support the conclusion that the Term Lenders are the only party able to recover under that provision. See Fourth Ocean Putnam Corp., 66 N.Y.2d at 45.

Second, the Term Lenders point to sections 2.3(d) and 10.5 of the Disbursement Agreement. Generally, the Disbursement Agreement was structured so that Disbursement Agreement Loans were paid into a Bank Proceeds Account. The Borrowers could not access the funds in this account until they fulfilled several conditions. During this time, the Lenders held a ratable security interest in funds in the Bank Proceeds Account, which provided additional security for the

10

Lenders "[t]o secure the payment and performance of each Borrower's obligations."  Based on this, the Term Lenders argue that they were the intended beneficiaries of the loan from the Revolving Lenders to the Borrowers because while the funds were in the Bank Proceeds Account, the Term Lenders gained the benefit of a ratable security interest in that account.

Again, we look to the language of the contract and find no express intention of the parties that the Term Lenders be the beneficiaries of the Revolving Lenders' promise to fund the Borrowers under section 2.1(c).  See Berry Harvester  Co. v. Walter A. Wood Mowing & Reaping Mach. Co., 46 N.E. 952, 955 (N.Y. 1897) ("Whether the right or privilege conferred by the promise of one party to a tripartite contract belongs to one or both of the other contracting parties depends upon the intention as gathered from the words used."); see also Stainless, Inc., 418 N.Y.S.2d at 80 ("The intention to benefit the third party must appear from the four corners of the instrument.").[4]  That the Term Lenders may have indirectly benefitted from a promise between the Revolving Lenders and Borrowers makes them incidental beneficiaries, not intended beneficiaries.  See Salzman v. Holiday Inns, Inc., 369 N.Y.S.2d 238, 261–62 (N.Y. App. Div. 1975) ("An incidental

---

[4] The Term Lenders ask us to consider the circumstances surrounding the contract.   However, we consider the background circumstances only when the language of the contract is ambiguous.  Berry Harvester Co., 46 N.E. at 955.  Like the District Court we find no ambiguity in the language of section 2.1(c) about the intended beneficiary, as it provides that "each Revolving Lender severally agrees to make Revolving Loans . . . to Borrowers from time to time during the Revolving Commitment Period." (emphasis added).

11

beneficiary is a person who may derive benefit from the performance of a contract though he is neither the promisee nor the one to whom performance is to be rendered . . . .").  As incidental beneficiaries, the Term Lenders are not in a position to require the performance of the Revolving Lenders.  See id.  Beyond that, the Term Lenders are not the only party able to recover for the breach.  This consolidated appeal also includes the Borrowers' suit against the Revolving Lenders for the purported breach of section 2.1(c), suggesting that other parties are able to recover for the alleged breach of contract.[5]  Cf. Fourth Ocean Putnam Corp., 66 N.Y.2d at 45. Thus, we have concluded that the Term Lenders lack standing to enforce the section 2.1(c) promise and affirm the District Court's dismissal of the breach of contract claims of the Term Lenders' complaint.

## B.  DENIAL OF THE BORROWERS' MOTION FOR SUMMARY JUDGMENT AGAINST THE REVOLVING LENDERS AND MOTION FOR TURNOVER

The Borrowers urge us to find that the Revolving Lenders broke their promise to fund under section 2.1(c)(iii) when they did not lend to the Borrowers

---

[5] The Term Lenders argue that they are the only party able to enforce the section 2.1(c)(iii) promise.  Specifically, they suggest that the Revolving Lenders breached because they were required to fund the Borrowers, even though the Borrowers also breached by failing to disclose an event of default.  Because the Term Lenders are the only non-breaching party in this scenario, the Term Lenders argue that they are the only party that may recover under section 2.1(c)(iii).  By way of this argument, the Term Lenders essentially ask us to assume the outcome of an ongoing contract dispute and decide that the Term Lenders have standing on the basis of this assumption.  This we will not do.  The language of the section 2.1(c)(iii) reveals an "intent to permit enforcement" by the Borrowers.  Fourth Ocean Putnam Corp., 66 N.Y.2d at 45.
 We therefore conclude that the Term Lenders are not the only party able to enforce the section 2.1(c)(iii) promise.

on March 2, 2009. Specifically, the Borrowers say that the Revolving Lenders were required to fund once the Borrowers simultaneously requested funds from the Delay Draw Term Loans and the Revolving Loans. The Revolving Lenders respond that they were right to reject the Borrowers' request because the Credit Agreement did not allow for this type of simultaneous request. After careful review, we have concluded that the relevant terms of the Credit Agreement are ambiguous. For this reason, we decline to hold, as a matter of law, that the Revolving Lenders breached the Credit Agreement when they did not fund the March 2, 2009 request.

The provision of the Credit Agreement at issue, section 2.1(c)(iii), requires the Revolving Lenders to make Revolving Loans to the Borrowers "unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000." Section 2.1(c)(iii) is found within section 2, which contains three provisions about the "amount and terms of [the loan] commitments" between the Lenders and Borrowers. Subsection (a) governs the disbursement of the Initial Term Loans, which were given to the Borrowers after the execution of the Credit Agreement. Subsection (b) describes the disbursement process for Delay Draw Term Loans. In relevant part, subsection (b) provides that "the proceeds of each Delay Draw Term Loan will be applied <u>first</u> to repay any then outstanding

13

Revolving Loans . . . and [any remaining funds will] <u>second</u> be credited to the Bank Proceeds Account." (emphasis in original).  Subsection (c) covers Revolving Loans and explains that the Revolving Lenders will make Revolving Loans to the Borrowers provided that "unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."

The Revolving Lenders argue that subsections (b) and (c) of the Credit Agreement establish a "sequential funding process" by which the Revolving Loans were the last loans to be funded to the Borrowers.  The Revolving Lenders urge us to read subsection (b)(i), which requires loans under the Delay Draw Commitments to be $150 million or greater, together with subsection (c)(iii), which provides that the Revolving Loans must not exceed $150 million "unless the Total Delay Draw Commitments have been fully drawn."  When read in context, the Revolving Lenders assert that the Delay Draw Term Loan Commitments could not be "fully drawn" under subsection (c)(iii) "until there were no funds left to pay off the $150 million."[6]  Thus, a simultaneous request for all of the funds from the Delay Draw Term Loans and all of the funds from the Revolving Loans is not allowed under

---

[6] This reasoning was articulated by the District Court in concluding that the term "fully drawn" means "fully funded."  On appeal, the Revolving Lenders adopt this position in urging us to agree with the District Court's interpretation.

14

the contract because the Delay Draw Term Loans are used to repay the Revolving Loans.

The Borrowers argue that the funding arrangement established through subsections (b) and (c) created a continuous flow-of-funds structure. The Borrowers appear to agree that the contract established a "sequential funding process," but say that the sequential process did not allow for the funding to stop when there was a simultaneous request for Revolving and Delay Draw Term Loans. Rather, the Borrowers assert that the Delay Draw Term Loans were only required to cover the Revolving Loans that were outstanding at the time the Borrowers requested the loan. In March 2009, the Borrowers argue that the Delay Draw Term Loans would have satisfied the outstanding Revolving Loan, meaning that the remainder of available funds should have been placed in the Bank Proceed Account to be disbursed to the Borrowers. Because the Revolving Lenders' interpretation of subsections (b) and (c) stopped the lending, the Borrowers argue it is at odds with the purpose of the agreement, which was to provide a steady flow of funds to the Borrowers.

The Borrowers also present several arguments why the phrase "fully drawn" in section 2.1(c)(iii) unambiguously means "fully requested." The Borrowers' primary argument is that the word "outstanding" is used other places in the contract to mean "funded." Because "outstanding" means "funded," the Borrowers

15

argue that the word "drawn" must mean "requested." The Revolving Lenders respond that "drawn" and "outstanding" have different meanings because they are used to describe loans that have different features.[7]

This seems to us a reasonable basis for disagreement over the interpretation of the Revolving Lenders' section 2.1(c)(iii) obligation and so we conclude that the meaning of the provision is ambiguous. See Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (N.Y. 2002) (explaining that a contract is unambiguous when it has a "definite and precise meaning"). This is in keeping with New York law which instructs that when there is a "reasonable basis for a difference of opinion" attended by a "danger of misconception," in a contract, it is to be deemed ambiguous. See Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978); see e.g., Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 430 (2d Cir. 1992) (applying New York law in examining the interrelationship between two provisions in an agreement and finding the contract susceptible to more than one meaning and therefore ambiguous).

---

[7] The Borrowers have also argued alternatively that the contract required the Revolving Lenders to lend to them even if the Borrowers had entered into default. Specifically, section 2.1 provides that "[t]he making of Revolving Loans which are Disbursement Agreement Loans to the Bank Proceeds Account shall be subject only to the fulfillment of the applicable conditions set forth in Section 5.2." Section 5.2(a) provides that funding after the submission of a Notice of Borrowing must comply with Section 2. From this, the Borrowers argue that the Revolving Lenders' obligation to fund was only conditioned by the term set forth in section 2. Because the Borrowers' failure to disclose an Event of Default was a condition governed by a different section, the Borrowers argue that the Revolving Lenders were obligated to fund because the Borrowers were in non-compliance with a provision outside of section 2. Again, we agree with the District Court that the clause cannot be read to make irrelevant the duties and obligations of the parties which are carefully outlined in several sections of the Credit Agreement.

16

Where, as here, "the language used is susceptible to differing interpretations . . . and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate." Seiden Assoc., 959 F.2d at 428. "Because of the presence of an ambiguity, an opportunity to present extrinsic evidence must be afforded to establish what the original contracting parties intended." Id. at 430. Based on this, we cannot conclude, as a matter of law, that the Revolving Lenders broke their promise to fund the Borrowers under section 2 of the Credit Agreement. For the same reasons, we also affirm the District Court's denial of the Borrowers' request for turnover of the loan proceeds and specific performance.

## III.   CONCLUSION

We affirm the District Court's dismissal of the Term Lenders' claims for lack of standing. We also affirm the District Court's denial of the Borrowers' summary judgment motion.

**AFFIRMED**.

17